Dagmar Gruy v. Commissioner. Viggo Gruy v. Commissioner. Joseph Gruy, Jr., Joseph Gruy, Guardian v. Commissioner.
Gruy v. Commissioner
Docket Nos. 18532, 18533, 18534.
United States Tax Court
1949 Tax Ct. Memo LEXIS 92; 8 T.C.M. (CCH) 787; T.C.M. (RIA) 49217; August 29, 1949
E. H. Suhr, Esq., for the petitioners. S. B. Anderson, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: In these consolidated proceedings the Commissioner determined deficiencies in individual income tax for the calendar years 1943 and 1944 as follows: Docket
No.
Petitioner
Year
Deficiency
18532
Dagmar Gruy
1943
$ 993.54
1944
1,366.83
18533
Viggo Gruy
1943
993.51
1944
1,522.71
18534
Joseph Gruy, Jr.,
1943
993.51
Joseph Gruy, Guardian
1944
1,366.83
Two issues are presented. Did the Commissioner err in determining: (1) That *93 the gains realized from the sale of real estate are taxable as ordinary income and not capital gains, as claimed by petitioners? (2) In refusing to reduce bonuses by disbursements incurred by petitioners incident to the execution by them of certain oil and gas leases? Findings of Fact Petitioners are residents of Hebbronville, Jim Hogg County, Texas, and each filed income tax returns for the calendar years 1943 and 1944 with the collector of internal revenue at Austin, Texas. Petitioners are children of Joseph Gruy, Sr., and Lucille (Kohler) Gruy. Their mother died February 18, 1933, and from her they inherited the real estate (and much other property) the profits from the sale of which are here in controversy. Their ages and occupations during the taxable years are as follows: Dagmar Gruy became twenty-one years of age on June 14, 1943. During 1943 she worked at the hotel in Hebbronville, Texas, which hotel belonged to petitioners. In February, 1944, she enrolled in the University of Texas at Austin, Texas, and was there for the remainder of that year. At the time of the hearing she was in Austin, taking a post graduate course. Viggo Gruy became twenty-one years old on October 30, 1944. From *94 January 1, 1943, until March 25, 1943, he was a student at Texas A. & M. College. From March 25, 1943, until some time in 1946 he served in the United States Army at Ft. Sam Houston, in San Antonio, Texas, Camp Hood, Texas, and Camp Polk, Louisiana, embarking for the European Theatre of War on February 13, 1944, and returning from Europe on February 12, 1946. Joseph Gruy, Jr., will become twenty-one years of age on May 28, 1950. In 1943 and 1944 he attended high school in Hebbronville, Texas. He was attending the University of Texas at the time of the hearing. Joseph Gruy, Sr., is the legal guardian of Joseph Gruy, Jr., and was the legal guardian of the other petitioners during their minority. From 1933 through 1944 his business was that of ranching and cattle raising, which he personally operated. He then owned about 3,000 cattle and his 1943 sale of cattle was $31,769, and in 1944, $16,212. He and the petitioners have never engaged in the real estate business or in the purchase and sale of real estate for themselves or others. Nor have they ever applied to the State of Texas for a license to act as a real estate dealer or real estate salesman, as the law of that state requires *95 for all persons so engaged. Petitioners' mother willed to each of them an undivided interest in real estate situated in three Texas counties, which she had inherited from her father, Viggo Kohler, who died in 1931. The property included a ranch of 10,000 acres, other acreage property and a large number of town lots, about 375 of the latter being in the Town of Hebbronville in the Kohler Addition [1] thereto, and a much lesser number of lots in the Town of Beeville. The population of Hebbronville was 2,400 and of Beeville 6,500. In 1938 administration of the estate of petitioners' mother was completed. Sales of town lots belonging to petitioners were made as follows: Number of
Year
Lots Sold
Gross Selling Price
1939
14 lots
$ 3,375.00
1940
24 lots
6,525.00
1941
15 lots
4,075.00
1942
14 lots
2,535.00
1943
54 lots
19,395.00
1944
40 lots
17,920.00 All of these sales were made by petitioners' father on their behalf. Petitioners negotiated no sales nor made any effort to sell lots. Civic leaders of Hebbronville interested in the town's growth urged petitioners' father *96 to put on a selling campaign of the lots, but he refused. He regarded the lots as a safe investment and was indifferent as to selling and made no effort to make sales. The purchasers, unsolicited in each instance, went to the father and made offers to buy and when he deemed the price offered sufficiently attractive, it was accepted. He received no commission for making the sales and none was paid to any one. The lots were not listed for sale, nor advertised, nor was a "for sale" sign placed on them. No improvements were made on the lots by petitioners or their father. The economic conditions produced by the war caused a greater demand in 1943 and 1944 for the purchase of the lots. From the sale of the lots in the taxable years each of the petitioners realized a gain of $5,257.96 in 1943, and of $5,185,24 in 1944, and each, in their income tax returns for the respective years reported such amounts as long term capital gains. Respondent in his notice of deficiency to each of the petitioners stated: "It has been determined that the gains from the sale of real estate in Hebbronville, Texas, are taxable as ordinary income instead of as capital gains. Since you reported in your returns *97 for 1942, 1943, and 1944 only 50% of the gain realized in those years, your income has been increased by $336.86 for 1942, $2,628.89 for 1943, and $2,592.62 for 1944." 2. Second Issue: Petitioners in 1944 executed certain oil and gas leases upon land belonging to them, for which lessees paid petitioners a total cash bonus of $13,671.22. Incident to the execution and delivery of same and requisite to securing acceptance of the leases, petitioners necessarily expended the sum of $1,014.58, itemized as follows: Publication of notices
$ 11.62
Recording fees
69.45
Revenue stamps
15.40
Attorneys' fees
352.56
Furnishing abstract
556.75
Court costs
8.80
$1,014.58
Petitioners deducted the $1,014.58 from the cash bonus received for the leases, then took statutory depletion on the balance and reported the net sum remaining as income. The leases were in ordinary form, providing for the exploration and development of the land for minerals, and providing a royalty of 1/8 of all oil and gas produced thereon. Respondent in his notice of deficiency to each of the petitioners stated: "It has been determined that the cost of $1,014.58 incident to the execution of *98 certain mineral leases in 1944 is a capital item which is recoverable through depletion. Accordingly, as the gross income from the leases in question was $13,671.22, the deduction for percentage depletion is $3,759.58, leaving a net income of $9,911.64 from the property. Your interest was one-third, or $3,303.88, instead of $3,058.69 as reported. Accordingly, your income from this source has been increased by $245.19." Opinion 1. Whether petitioners' profits from the sale of town lots constituted "capital gains" for income tax purposes, as they claimed, or "ordinary income" as determined by the Commissioner, depends upon the application of section 117, I.R.C., to the facts here developed. That part of the section here pertinent provides that: "* * * The term 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business), but does not include * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, * * *" Respondent's brief, after summarizing some of the evidence, declares, "It is reasonable to infer that the lots were held by petitioners for sale to *99 customers in the ordinary course of trade or business." Such an inference is not warranted, since the evidence in our opinion shows the contrary to be true. We agree with respondent that a person may conduct business through another, and even though the petitioners personally did not negotiate the sales, if their father, acting as their agent, was engaged in the trade or business of selling lots and the same were held primarily for sale to customers, this would make the provision of the section applicable, but the facts show that neither the petitioners personally nor through their father as agent were engaged in such trade or business, and that the lots were not held primarily for sale to customers. Respondent stresses the number of sales made and quotes from Ehrman v. Commissioner, 120 Fed. (2d) 607 (affirming 41 B.T.A. 652) to the effect that "the frequency or continuity of the transactions" determines the status of whether or not one is engaged in a trade or business. There 186 lots were sold in the taxable year and liquidation actuated the sales made. However, a selling agent was employed for 5 per cent on gross sales and a salary of $500 a month *100 for maintaining a selling organization. Taxpayers also paid out substantial sums in improving the property, including sidewalks, public utilities, street improvements, water, gas, landscaping, etc. The facts here are different and are like those in Frieda E. J. Farley, 7 T.C. 198, cited by petitioners, wherein it was said: "* * * Nor did petitioner engage in any activities whatsoever to promote sales. He did no advertising, hired no agents, did not list the property, and erected no sings. Petitioner, in our opinion, merely accepted satisfactory offers from unsolicited purchasers. It would seem that petitioner could have maintained a more passive role only by refusing to sell at all." The facts here, as there, also indicate that the sales in question appear to have been essentially in the nature of a gradual and passive liquidation without "extensive development" and "sales activity." In the Farley case, in dealing with Ehrman v. Commissioner, supra, and Richards v. Commissioner, 81 Fed. (2d) 369, both cited by respondent, we said that where the liquidation of an estate is accompanied by extended development and sales activity the mere fact *101 of liquidation will not be considered as precluding the existence of a trade or business. In the absence of these elements, however, we held that liquidation could not be disregarded, and hence in the Farley case we held that profits derived from sales were taxable as long term capital gains. Approval of the Tax Court's reasoning and result in the Farley case was expressed by the Fifth Circuit in their opinion in White v. Commissioner, 172 Fed. (2d) 629. We hold that petitioners' profits from sale of the lots are taxable as capital gains rather than as ordinary income. 2. Petitioners charge error in respondent's failure to reduce the bonus of $13,671.22 received on the leasing of two oil and gas properties by expenditures of $1,014.58 which were incurred and paid incident to the execution and delivery of the leases. Under the view that the amounts paid were capital in nature respondent determined that they were recoverable through depletion, and he accordingly computed as a depletion deduction 27 1/2 per cent of the entire bonus undiminished by the $1,014.58. Section 114 (b) (1) provides generally that the basis for depletion shall be the adjusted basis provided in *102 section 113, which is normally cost. But subsection (b) (3) provides exceptionally that: "* * * in the case of oil and gas wells the allowance for depletion under section 23 (m) shall be 27 1/2 per centum of the gross income from the property during the taxable year, excluding from such gross income an amount equal to any rents of royalties paid or incurred by the taxpayer in respect of the property. * * *" Obviously the entire $13,671.22 was paid by the lessees as bonus. We are of opinion that all of it retained that character in the hands of the recipient petitioners. Subsection (b) (3) is not concerned either with cost or with expenses. Depletion under its provisions is not computed by reference to these factors but as a fraction of "gross income." The entire payment was "gross income." Specifically subsection (b) (3) permits the exclusion of "rents or royalties paid or incurred by the taxpayer in respect of the property," but this explicit exception serves to stress that nothing else is to be excluded. Petitioners argue that if no oil or gas should be produced, they would be required later to report the depletion deduction as income, and never would be allowed to deduct the *103 $1,014.58. Regulations 111, sec. 29.23 (m)-10 (c). What, if any, recognition should be given to the disbursements in controversy in such an eventuality is a question not germane to the issue. The error assigned is respondent's refusal to allow them to "be deducted from the cash bonuses," and as we find this refusal warranted by the wording of section 114 (b) (3), we sustain his determination in this respect. Decisions will be entered under Rule 50. Footnotes
1. Vigo Kohler subdivided this property into blocks and lots in 1913.↩